**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ELGIN MAYS,

               Petitioner,

vs.                                      Case No. 3:15-cv-495-J-34JRK
                                            3:12-cr-110-J-34JRK

UNITED STATES OF AMERICA,

               Respondent.

_____/

## REPORT AND RECOMMENDATION[1]

      Petitioner Elgin Mays ("Petitioner"), proceeding pro se, filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. No. 1[2]; "§ 2255 Motion") on April 20, 2015. The Government filed a response in opposition on November 5, 2015. See United States' Response in Opposition to Petitioner's Pro Se 28 U.S.C. § 2255 (Doc. No. 9). Petitioner claims in Ground One of the § 2255 Motion that his trial counsel refused to file a requested appeal. § 2255 Motion at 14-15.[3]

---

[1]     "Within 14 days after being served with a copy of [a report and recommendation on a dispositive issue], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." Id. A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. See Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02; Rule 12, Rules Governing Section 2255 Proceedings.

[2]     Citations to Petitioner's criminal case file, United States v. Mays, No. 3:12-cr-110-J-34JRK, are denoted as "Crim. Doc. No. ____." Citations to Petitioner's civil § 2255 case file, Mays v. United States, No. 3:15-cv-495-J-34JRK, are denoted as "Doc. No. ____."

[3]     The pagination of the § 2255 Motion is not continuous. Citations to the § 2255 Motion follow the pagination assigned by the Court's electronic filing system (CM/ECF).

On February 5, 2018, the Honorable Marcia Morales Howard, United States District Judge, entered an Order directing that the undersigned conduct an evidentiary hearing consistent with the applicable law of the United States Court of Appeals for the Eleventh Circuit and issue a report and recommendation with regard to the issue raised in Ground One. See Order Referring Motion for Evidentiary Hearing (Doc. No. 11), signed February 5, 2018 and entered February 6, 2018.

On February 8, 2018, consistent with Judge Howard's direction, the undersigned appointed Paul A. Shorstein, Esquire to represent Petitioner. See Order (Doc. No. 12), signed February 8, 2018 and entered February 9, 2018. In the same Order appointing Mr. Shorstein, the undersigned set a status hearing for February 13, 2018. See id. At the February 13, 2018 hearing, a second status hearing was set for March 1, 2018.[4] See Clerk's Minutes (Doc. No. 13); see also Order (Doc. No. 14), entered February 14, 2018. The second status hearing was held as scheduled, and Petitioner was present with counsel. See Clerk's Minutes (Doc. No. 15). After hearing from all interested parties, the evidentiary hearing was set for March 21, 2018. See id.; see also Order (Doc. No. 16), entered March 2, 2018.

At the March 21, 2018 evidentiary hearing, two witnesses testified. See Clerk's Minutes (Doc. No. 17); Transcript (Doc. No. 18; "Tr."), filed April 18, 2018, at 2. Petitioner testified on his own behalf. Tr. at 2; see Tr. at 6-76. Sylvia Irvin, Esquire ("Ms. Irvin"), Petitioner's counsel in the underlying criminal case, was called as a witness by the

---

[4]     Petitioner did not appear for the February 13, 2018 status hearing, as his presence was not required for the logistical issues discussed.

Government. Tr. at 2; see Tr. at 77-109. No exhibits were received into evidence. Tr. at 2. The matter is now ripe for decision.

## I. Procedural History of Criminal Case

Petitioner was charged on July 18, 2012 in a three-count indictment with distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count One and Count Two) and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and (e) (Count Three). See Indictment (Crim. Doc. No. 1). Normally, 18 U.S.C. § 922(g)(1) carries a maximum term of imprisonment of ten years. Here, however, the Indictment alleged various prior convictions that qualified Petitioner as an armed career criminal under the Armed Career Criminal Act ("ACCA"). See Indictment at 2-4; 18 U.S.C. § 924(e). Petitioner was thus subject to a fifteen-year mandatory minimum term of imprisonment and a maximum term of life imprisonment. See 18 U.S.C. § 924(e).

On September 13, 2012, Petitioner made his initial appearance, and he requested court-appointed counsel. See Clerk's Minutes (Crim. Doc. No. 6; "Initial Appearance Minutes"); Oral Motion to Appoint Counsel (Crim. Doc. No. 7). Petitioner was found to be indigent, and the Federal Public Defender was appointed to represent him. See Initial Appearance Minutes; Order (Crim. Doc. No. 10), entered September 13, 2012. Ms. Irvin, an Assistant Federal Public Defender, filed a Notice of Appearance (Crim. Doc. No. 12) on September 17, 2012. On September 18, 2012, Petitioner was arraigned with Ms. Irvin present, and he pleaded not guilty to all three counts charged in the indictment. See Clerk's Minutes (Crim. Doc. No. 14; "Arraignment Minutes"). At the arraignment, Petitioner moved

-3-

to obtain the criminal history portion of the Pretrial Services Report, and the Court granted the motion. Arraignment Minutes at 2; Order (Doc. No. 18), entered September 19, 2012.

On August 15, 2013, pursuant to a written plea agreement ("Plea Agreement"), Petitioner pleaded guilty to Count Three in exchange for, among other things, the dismissal of Counts One and Two. See Clerk's Minutes (Crim. Doc. No. 35); Plea Agreement (Crim. Doc. No. 37); Report and Recommendation (Crim. Doc. No. 38). At the change of plea hearing, after being advised of the impact of a felony conviction and all related matters required by Rule 11, Federal Rules of Criminal Procedure ("Rule(s)"), Petitioner was asked by the Court: "Mr. Mays, do you fully understand all of the rights that you have, sir, and the rights that you waive and give up by pleading guilty?" Transcript of Change of Plea Hearing (Crim. Doc. No. 59; "COP Tr."), filed August 14, 2015, at 13. Petitioner responded, "Yes, sir." COP Tr. at 13.

Moreover, the Court reviewed paragraph 6.B. of the Plea Agreement with Petitioner, which provides:

> [Petitioner] expressly waives the right to appeal [his] sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines [("Guidelines")], except (a) the ground that the sentence exceeds [Petitioner's] applicable guidelines range as determined by the Court pursuant to the . . . Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then [Petitioner] is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

Plea Agreement at 14; see COP Tr. at 22-23. Petitioner confirmed that he understood what he was waiving and giving up in that paragraph and that he was making the waiver freely and voluntarily. COP Tr. at 23.

When the change of plea hearing concluded, Ms. Irvin elected to waive the fourteen-day period to object to the Report and Recommendation of the undersigned. COP Tr. at 33. On September 4, 2013, the Court accepted Petitioner's guilty plea and adjudicated him guilty. See Acceptance of Plea of Guilty, Adjudication of Guilt, and Notice of Sentencing (Crim. Doc. No. 39), signed September 4, 2013 and entered September 5, 2013.

Thereafter, a Presentence Investigation Report ("PSI") was prepared by the probation officer. According to the PSI, Petitioner had an adjusted offense level of 31 and a criminal history category of VI. Transcript of Sentencing Hearing (Doc. No. 61; "Sentencing Tr."), filed August 17, 2015, at 3. The range of imprisonment under the Guidelines was 188 to 235 months. Sentencing Tr. at 4. The statutory mandatory minimum term of imprisonment was fifteen years and the maximum term of imprisonment was life. See 18 U.S.C. § 924(e).[5]

On April 29, 2014, the Government filed a Motion for Reduction of Defendant's Sentence (Doc. No. 47; "Motion for Reduction of Sentence"), pursuant to Rule 35(b) and 18 U.S.C. § 3553(e). Consequently, the Court was no longer bound by the fifteen-year mandatory minimum term of imprisonment. In the Motion for Reduction of Sentence, the Government moved for a two-level reduction of Petitioner's offense level based on Petitioner's cooperation in the investigation of a cocaine distribution organization. Motion for

---

[5]   The ACCA increased the maximum term of imprisonment for possession of a firearm by a convicted felon from ten years to life and required a mandatory minimum term of imprisonment of fifteen years. See 18 U.S.C. §§ 924(a)(2), (e).

Reduction of Sentence at 1. On May 1, 2014, Petitioner filed a Sentencing Memorandum (Doc. No. 48) in which he requested that the Court "fashion a sentence of imprisonment that is below the Guidelines." Sentencing Memorandum at 6.

Petitioner's sentencing hearing was held on May 5, 2014. See Minute Entry (Crim. Doc. No. 49). The Court granted the Motion for Reduction of Sentence, which reduced the range of imprisonment under the Guidelines to 151 to 188 months. Sentencing Tr. at 7. The Government recommended a sentence of 151 months. Sentencing Tr. at 5. Petitioner requested a variance to a range of imprisonment of 22 to 115 months. Sentencing Tr. at 14. Ultimately, the Court sentenced Petitioner to 120 months' imprisonment. See Sentencing Tr. at 15; Judgment in a Criminal Case (Crim. Doc. No. 50), signed May 5, 2014 and entered May 6, 2014, at 2. The sentence resulted from a downward departure based upon cooperation and a variance. Counts One and Two were dismissed pursuant to the Plea Agreement. See Judgment in a Criminal Case at 1.

At the sentencing hearing, the Court advised Petitioner, "[I]f you wish to pursue an appeal, you have to file a notice of appeal within [fourteen] days." Sentencing Tr. at 17. Petitioner did not file a notice of appeal. As noted above, Petitioner filed the § 2255 Motion on April 20, 2015. Upon its filing, the civil docket was created by the Clerk. In Ground One of the § 2255 Motion, Petitioner claims that he asked Ms. Irvin to file a notice of appeal and that she was ineffective in failing to do so. See § 2255 Motion at 14-15. Specifically, Petitioner alleges that "he felt he was not an armed career offender, counsel disagreed with Petitioner and never filed an [a]ppeal . . . ." Id. at 14. In the § 2255 Motion, Petitioner asserts he instructed Ms. Irvin to appeal his sentence on the day of his sentencing. Id.; see also id.

at 15 (alleging that he told Ms. Irvin, "Counsel, please [a]ppeal my case, because [ten] years is too much time, and my priors are invalid for [armed career criminal] status").

## II. March 21, 2018 Evidentiary Hearing

**A. Petitioner's Testimony**

### 1. Direct Examination

Petitioner testified on direct examination that when he entered into the Plea Agreement, he understood that the ACCA applied to him. Tr. at 9.[6] According to Petitioner, he and Ms. Irvin never discussed any challenges to the applicability of the ACCA. Tr. at 9. Petitioner stated that Ms. Irvin told him he faced a mandatory minimum sentence of fifteen years in prison. Tr. at 10. He ultimately decided to enter into the Plea Agreement and cooperate with the Government to try to "get under [fifteen] years." Tr. at 10. Petitioner confirmed he understood that in the Plea Agreement he waived certain rights to an appeal, but he did not remember specifically what rights he waived. Tr. at 11. Petitioner did not recall discussing any possibilities for appeal with Ms. Irvin before his sentencing. Tr. at 13. At that time, he was not concerned with appealing, he was "focused on cooperating and trying to get less than [fifteen] years." Tr. at 13-14.

Petitioner testified that prior to his sentencing, he reviewed the PSI with Ms. Irvin, but he did not remember whether he raised any objections to or issues about it. Tr. at 14. He did not recall whether they discussed any issues for an appeal after reviewing the PSI. Tr. at 14-15. When asked at the hearing how he felt about the sentence he received, Petitioner replied,

---

[6]     Petitioner was initially held for pretrial detention at the Baker County Jail for "[p]robably four or five months," after which he was transferred to D. Ray James Correctional Facility ("D. Ray James"). Tr. at 60-61. Petitioner testified he entered into the Plea Agreement while he was being housed at D. Ray James. Tr. at 8.

"[I]t was all right, ten years, but I was looking for less." Tr. at 15. Petitioner recalled Judge Howard advising him that he had fourteen days to file a notice of appeal. Tr. at 22.

He stated that either "[w]hen [he] got sentenced or right after [he] got sentenced," he asked Ms. Irvin whether there was "anything that [they could] do about appealing the sentence." Tr. at 18. He indicated, however, he did not ask her to file a notice of appeal, Tr. at 18-19, directly contradicting his claim in the § 2255 Motion. He also testified he asked her "to come see [him] at D. Ray James." Tr. at 18. According to Petitioner, Ms. Irvin told him that she would go see him, Tr. at 18, but she never did, Tr. at 19. He stated that while he was at D. Ray James, he did not have any way of communicating with Ms. Irvin other than meeting at D. Ray James. Tr. at 21. He testified specifically that he could not make a collect call to her. Tr. at 23. Petitioner stated that fourteen days after he was sentenced, he knew "it was too late to appeal." Tr. at 22.

According to Petitioner, he was transferred from D. Ray James to a local jail in Oscilla, Georgia ("Oscilla") two weeks after his May 5, 2014 sentence. Tr. at 20. Petitioner testified he stayed in Oscilla for "about a month and a half," and he did not have any type of communication with Ms. Irvin while he was there. Tr. at 21-22. He was then transferred to the Coleman Federal Correctional Complex ("Coleman") in July 2014. Tr. at 24. He has been imprisoned there since. Tr. at 24. Sometime in 2015, Petitioner e-mailed Ms. Irvin[7] about

---

[7]     When questioned by the Court, Petitioner testified that he obtained Ms. Irvin's e-mail address from a business card she gave him when she began representing him. Tr. at 73-74. According to Petitioner, when he was transferred from D. Ray James to Oscilla, he had to mail the business card home because "they would[ not] allow [him] to take it to Oscilla . . . with [him]." Tr. at 74. He got it back once he was transferred to Coleman. Tr. at 74. So, it appears Petitioner had Ms. Irvin's business card during his detention at D. Ray James.

cooperating to further reduce his sentence. Tr. at 25.[8] During this e-mail conversation, they did not discuss appealing his sentence. Tr. at 26.

Petitioner was asked to explain "how [he] got to a point where [he] thought maybe [he] could have an appeal or at least make an argument that [he] still ha[d] a right to an appeal." Tr. at 27. Petitioner explained that after conducting legal research at Coleman, his "thought process was that the <u>Johnson</u> case[9] probably helped [him] out . . . ." Tr. at 27. Based on that research, Petitioner filed the § 2255 Motion. Tr. at 28. He testified, however, that he did not know how <u>Johnson</u> would have helped him. Tr. at 28.

### 2. Cross-Examination

On cross-examination, Petitioner stated that before he entered his guilty plea, he had concerns about waiving his appeal rights, but he did not recall if he and Ms. Irvin discussed those concerns. Tr. at 33. He later testified, however, that he never raised the issue of appealing to Ms. Irvin at any time before sentencing. Tr. at 35. He did not express any disagreement with Ms. Irvin about his prior state convictions. Tr. at 40. He confirmed that on the day of the sentencing hearing, he was "pleased" with his sentence. Tr. at 42. He stated that although he "was looking for less," he "was okay with it." Tr. at 43.

While at D. Ray James, Petitioner used the phone facility to call people. Tr. at 51. He was able to call them because "they[ would] put money on the phone." Tr. at 51. He did not call Ms. Irvin. Tr. at 52. He confirmed that he "chose" not to call Ms. Irvin, and—contrary to

---

8      According to Petitioner, he was not able to cooperate further because he needed another person to help, but she "did[ not] go through with it." Tr. at 27.

9      Petitioner is referring to <u>Johnson v. United States</u>, 135 S.Ct. 2551 (2015). In <u>Johnson</u>, the United States Supreme Court held that the residual clause of the ACCA's definition of violent felony is unconstitutionally vague. <u>See Johnson</u>, 135 S.Ct. at 2563.

his testimony on direct examination—that there was nothing stopping him from calling her. Tr. at 52. After he was sentenced, he did not call anyone because he did not have money to do so. Tr. at 52. He acknowledged, however, that he could have called collect to the Public Defender's Office, where Ms. Irvin worked at the time. Tr. at 53.

Finally, the undersigned asked Petitioner if Ms. Irvin discussed with him any legal challenges to the ACCA. Tr. at 57. Contrary to his testimony on direct examination, Petitioner responded that she discussed this issue with him, but he did not remember what she told him. Tr. at 57. He then confirmed, however, that Ms. Irvin advised him that he was not likely to win based on any legal challenges to the ACCA and that this was why he chose to cooperate to reduce his sentence. Tr. at 57-58, 62.

Petitioner did not request that Ms. Irvin raise any objections to the PSI at the sentencing hearing. Tr. at 64. He did not instruct Ms. Irvin to file a notice of appeal after the sentencing hearing. Tr. at 67. Petitioner was asked, "Did you ever ask [Ms. Irvin] to file an appeal?" Tr. at 67. Petitioner responded, "No, sir." Tr. at 67. Petitioner confirmed that he filed the § 2255 Motion under penalty of perjury and that in the § 2255 Motion he claimed he asked Ms. Irvin to file a notice of appeal. Tr. at 68-71.

**B. Ms. Irvin's Testimony**

<u>1. Direct Examination</u>

Ms. Irvin worked for the Federal Public Defender's Office in Jacksonville from 2008 until 2014. Tr. at 77. In September 2014, she joined the Federal Public Defender's Office in Nevada. Tr. at 77. Prior to working as an Assistant Federal Public Defender, she was a staff attorney in the Fourth Judicial Circuit for four and a half years, and she clerked on the criminal court of appeals in Alaska. Tr. at 77-78. Ms. Irvin testified she is a note-taker as this

is the best way she has found to monitor her cases. Tr. at 78-79. She also tracks the time spent on her cases by "input[ing her] time usually as it's going on during the day or at least by the end of the day or the end of the week." Tr. at 79. At the hearing, she had her "trial file, [her] time sheets, and any other notes that [she] had as part of [Petitioner's] file." Tr. at 78.

Ms. Irvin testified that according to her notes, she had her first meeting with Petitioner on September 18, 2012 to discuss his case (shortly after his arraignment, at which she was present). Tr. at 79. In all, she visited him eight times at the Baker County Jail. Tr. at 82. Her notes also indicate that during these visits she reviewed with Petitioner the "indictment, the discovery, his guidelines, whether or not he was looking at a career offender or . . . armed career criminal sentence." Tr. at 80. She and Petitioner also discussed suppression of evidence issues and thereafter began talking about whether he wished to enter a guilty plea. Tr. at 80.

While Petitioner was at D. Ray James, Ms. Irvin personally met with him a total of ten times, Tr. at 83, and spoke with him on the phone four times, Tr. at 91. Ms. Irvin stated that during the time Petitioner was at D. Ray James, the Federal Public Defender's Office had "either a toll-free number, or . . . a number that [clients] were able to call where it was not charged to their account." Tr. at 92.

According to Ms. Irvin's documentation, she had multiple meetings with Petitioner during which they discussed whether he wished to enter a guilty plea: on February 20, 2013; March 19, 2013; May 20, 2013; and July 16, 2013. Tr. at 81. They reviewed the Plea Agreement on August 7, 2013. Tr. at 81-82. As to the ACCA issue, she conducted her own review of Petitioner's criminal record and consulted with other lawyers in her office. Tr. at 80. Based on her research, she concluded Petitioner was an armed career criminal under the

ACCA. Tr. at 81. She testified that she reviewed with Petitioner his status as an armed career criminal. Tr. at 81. She did not recall whether Petitioner had any specific questions about the impact of the ACCA on his sentence, but she stated they had "several conversations about the [fifteen]-year to life possibility and what [they] could do to get away from that situation." Tr. at 83. She testified they also had discussions about the nature of his underlying state convictions and whether there were ways to challenge them as qualifying offenses under the ACCA. Tr. at 84.[10]

Ms. Irvin met with Petitioner on five occasions to prepare for the sentencing hearing: October 28, 2013; November 20, 2013; December 11, 2013; December 30, 2013; and February 18, 2014. Tr. at 90-91. They also spoke on the phone two times in February 2014. Tr. at 90. Prior to sentencing, there was nothing that Petitioner said or did that would have indicated he wanted to appeal. Tr. at 88-89.

According to Ms. Irvin, on the day of the sentencing hearing, she met with Petitioner in the U.S. Marshals' holding cell before and after the hearing. Tr. at 93, 94. She recalled discussing with Petitioner on that day whether he wanted to appeal. Tr. at 94. Her timekeeping notes regarding those meetings state, "Not want to appeal. Happy with sentence," and "Client does not want to appeal and was happy with his sentence." Tr. at 94. Ms. Irvin stated she did not recall Petitioner requesting that she visit him at D. Ray James, and there is no indication from her notes that he made such a request. Tr. at 97.

---

[10]     She stated that when she reviewed her notes prior to the evidentiary hearing, she saw a note regarding Petitioner's "prior offenses and whether they could be considered as separate offenses." Tr. at 84. She was unable to find the note at the hearing. See Tr. at 84-85.

After Petitioner was sentenced, he and Ms. Irvin communicated via e-mail "for about another year" after he "got to the [Federal Bureau of Prisons ("BOP")]." Tr. at 95.[11] She testified that they e-mailed regarding Petitioner's cellphone because he wanted to have it returned to his sister. Tr. at 95. They also discussed the possibility of reducing his sentence further through additional cooperation. Tr. at 95. According to Ms. Irvin, Petitioner did not communicate any desire or instruction to appeal his sentence. Tr. at 96. She testified her notes do not show that she visited Petitioner at D. Ray James after he was sentenced. Tr. at 97.[12] Ms. Irvin stated that if Petitioner had requested that she visit him, she would have done so. Tr. at 97.

### 2. Cross-Examination

On cross-examination, Ms. Irvin confirmed she was aware of circumstances under which a defendant may challenge an ACCA determination despite having entered into a plea agreement with an appeal waiver. Tr. at 98. She stated she was no longer practicing in the Eleventh Circuit at the time Johnson was decided, so she did not know "how successfully those types of Johnson challenges . . . are happening in the Eleventh [Circuit]." Tr. at 99. She testified that "had [Petitioner] asked [her] to file an appeal, whether walking out the door of the sentencing hearing that day or afterwards in the U.S. Marshal[s'] hold, I would have filed the notice of appeal for him." Tr. at 108.

---

[11]   Petitioner was transferred to the BOP around July 2014 when he was transferred from Oscilla to Coleman. See Tr. at 24.

[12]   Ms. Irvin stated that her notes would not reflect whether she visited Petitioner at D. Ray James after he was sentenced because she stopped keeping track of her time after she left her employ at the Federal Public Defender's Office in Jacksonville about a month and a half after Petitioner's sentencing. Tr. at 97.

### III. Discussion

There are two requirements that a petitioner must meet to prevail on a claim of ineffective assistance of counsel: 1) "counsel's representation fell below an objective standard of reasonableness"; and 2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). The two requirements are commonly referred to as the "performance" and "prejudice" prongs respectively. Reece v. United States, 119 F.3d 1462, 1464 n.4 (11th Cir. 1987) (quotation and citation omitted). If a petitioner fails to establish either, a court need not consider the other prong in finding no ineffective assistance of counsel. Strickland, 466 U.S. at 697; see also Reece, 119 F.3d at 1464 n.4 (declining to consider the performance prong after finding that the petitioner failed to satisfy the prejudice prong).

"[A] lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (citations omitted). In this instance, prejudice is presumed, and the defendant/petitioner is entitled to a new appeal without any further showing. Id. (stating that "[t]he . . . denial of the entire judicial proceeding itself, which a defendant wanted at the time and to which he had a right . . . demands a presumption of prejudice"); Peguero v. United States, 526 U.S. 23, 28 (1999) (citation omitted) (stating that "when counsel fails to file a requested appeal, a defendant is entitled to . . . an appeal without showing that his appeal would likely have had merit"). This is so even when a defendant/petitioner entered into a plea agreement and waived the right to appeal his sentence. See Gomez-Diaz v. United States, 433 F.3d 788, 792-93 (11th Cir. 2005); Hernandez v. United States, 212 F. App'x 832, 833-

85 (11th Cir. 2006). "At the other end of the spectrum, a defendant who explicitly tells his attorney <u>not</u> to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently." <u>Flores-Ortega</u>, 528 U.S. at 477 (citing <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983) (holding that accused has ultimate authority to make fundamental decision whether to take an appeal)).

Somewhere near the middle of the spectrum, when a defendant neither specifically directs his attorney to file a notice of appeal nor specifically directs his attorney not to appeal, counsel may have a duty to consult with the defendant about appealing. <u>See</u> <u>id.</u> at 478. The term "consult" means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." <u>Id.</u> at 478. Counsel does not have a per se obligation to consult with the defendant about an appeal. Instead, counsel has a duty to consult with the defendant "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." <u>Id.</u> at 480. Thus, counsel acts in an unreasonably deficient manner if she fails to consult with the defendant under either of these circumstances. <u>Id.</u>

A court considers various factors in assessing the credibility of witnesses, including a witness's demeanor, the consistencies or inconsistencies within the witness's testimony, and any interest the witness may have in the outcome of the hearing; but the court does not consider the official rank or status of the witness. <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749-50 (11th Cir. 2002); <u>see also</u> <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such

as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it"). In the context of a § 2255 evidentiary hearing in which "the issue comes down to the 'bare-bones testimony' of the defendant against the contradictory testimony of counsel," a court must be sure to consider the relevant factors and articulate the reason(s) for crediting one over the other. Gallego v. United States, 174 F.3d 1196, 1198-99 (11th Cir. 1999).

Here, after considering the evidence and observing the witnesses and their demeanor while they testified, the undersigned credits the testimony and notes of Ms. Irvin and finds that Petitioner's testimony is for the most part not credible, particularly to the extent that he claims he asked Ms. Irvin to speak with him about appealing his case and that she told him she would visit him at D. Ray James to discuss the matter. Petitioner's representation in the § 2255 Motion that he instructed Ms. Irvin to appeal his sentence is also discredited. See § 2255 Motion at 15. The undersigned finds Petitioner communicated to Ms. Irvin that he was satisfied with his sentence and that he did not want her to file a notice of appeal. Even assuming that Petitioner did not communicate this to Ms. Irvin, she did not have a duty to consult with Petitioner about appealing. Accordingly, Ms. Irvin did not perform deficiently in not filing a notice of appeal. The reasons for these findings follow.

Petitioner never instructed Ms. Irvin to file a notice of appeal; indeed, he affirmatively indicated to her that he did not want her to appeal. Petitioner's representation in the § 2255 Motion that he asked Ms. Irvin to appeal his sentence because he thought 120 months of imprisonment was "too much time," § 2255 Motion at 15, is flatly contradicted by his own testimony and Ms. Irvin's testimony and supporting documentation. At the evidentiary

hearing, Petitioner denied multiple times that he asked Ms. Irvin to file a notice of appeal. See Tr. at 19, 28, 67. Instead, he stated that he asked Ms. Irvin about the possibility of appealing, and that she failed to address this inquiry. See Tr. at 18-19, 28, 67. The fact that Petitioner claimed in the Petition, under penalty of perjury, that he asked Ms. Irvin to file a notice of appeal, but he later testified under oath that he never asked her to appeal, severely undermines Petitioner's credibility. Further, Ms. Irvin stated that her notes about her meetings with Petitioner on the day of the sentencing hearing indicate that he did not wish to appeal and was happy with his sentence. Tr. at 94. Ms. Irvin's testimony and her notes show that Petitioner in substance affirmatively directed Ms. Irvin not to file a notice of appeal. Thus, Ms. Irvin did not fail to file a notice of appeal in derogation of Petitioner's wishes. See Flores-Ortega, 528 U.S. at 477.

Assuming, arguendo, that Petitioner did not affirmatively direct Ms. Irvin not to file a notice of appeal, the undersigned finds that Ms. Irvin did not have a duty to consult with Petitioner about appealing because 1) a rational defendant would not want to appeal, and 2) Petitioner did not demonstrate to Ms. Irvin that he was interested in appealing. See id. at 480.[13] Thus, Ms. Irvin did not perform deficiently. These findings are further explained below.

First, a rational defendant would not want to appeal because nonfrivolous grounds for appeal did not exist. See id. As noted above, Petitioner pled guilty, and in entering into the

---

[13]     As noted, Ms. Irvin testified that based on her recollection and notes, she met with Petitioner on the day of sentencing to discuss the sentence and appeal. See Tr. at 94. The notes, however, do not indicate whether Ms. Irvin discussed the advantages and disadvantages of appealing; that is, whether she "consulted" with Petitioner, as that term is defined in Flores-Ortega, 528 U.S. at 478. Based on the totality of the circumstances, it is reasonable to infer that Ms. Irvin did not consult with Petitioner, and it was reasonable for her not to do so. For purposes of this report and recommendation, the undersigned assumes that Ms. Irvin did not consult with Petitioner, as that term is defined in Flores-Ortega, 528 U.S. at 478.

Plea Agreement, Petitioner waived his right to appeal except in limited circumstances. See Plea Agreement at 14. None of these circumstances were present: Petitioner was not sentenced above the ten-year statutory maximum under 18 U.S.C. § 924(a)(2), which was the maximum term of imprisonment absent the ACCA enhancement;[14] he was not sentenced above the Guidelines (indeed, his sentence was two and a half years less than the low end of the range of imprisonment under the Guidelines); there are no allegations that the sentence violated the Eighth Amendment; and the Government did not appeal. See Tr. at 46. Thus, given that Petitioner did not appear to have a viable appeal under the terms of the appeal waiver, a rational defendant would not want to appeal. See Devine v. United States, 520 F.3d 1286, 1288 (11th Cir. 2008) (finding there were no nonfrivolous grounds for appeal because the defendant waived his right to appeal when he pled guilty).

Second, Petitioner did not reasonably demonstrate to Ms. Irvin that he wanted to appeal. Petitioner's testimony that he asked Ms. Irvin about the possibility of appealing and that she failed to address this inquiry is discredited as it is inconsistent with Ms. Irvin's testimony and written notes. The undersigned credits Ms. Irvin's testimony that Petitioner did not say or do anything that would have indicated he wanted to appeal. Tr. at 88-89. Ms.

---

[14] An appeal waiver "does not bar a claim challenging an ACCA enhancement where the defendant reserved the right to appeal a sentence in excess of the statutory maximum and the ACCA enhancement increases that maximum." United States v. Cilla, 712 F. App'x 880, 883 (11th Cir. 2017) (citing United States v. Jones, 743 F.3d 826, 828 n.2 (11th Cir. 2014) (denying the government's motion to dismiss appeal based on an appeal waiver because due to the ACCA enhancement, the defendant received a sentence of fifteen years of imprisonment, which exceeded the statutory maximum of ten years)). Here, Petitioner's sentence of ten years of imprisonment did not exceed the statutory maximum permitted under 18 U.S.C. § 924(a)(2) without application of the ACCA enhancement. Thus, given the appeal waiver and the sentence Petitioner received, a reasonable defendant would not have wanted to appeal.

Irvin's testimony is corroborated by her notes and to some extent by Petitioner's own testimony.

Importantly, Petitioner was rather content with his sentence on the day of the sentencing hearing, and his actions did not indicate that he wanted to appeal it. In fact, as noted above, it was clear to Ms. Irvin that he did not want to appeal. See Tr. at 88-89. Petitioner indicated he was "pleased" with the sentence, Tr. at 42, and was "okay with it," Tr. at 43, and Ms. Irvin's notes indicate he was "happy" with it, Tr. at 94. Further, Petitioner stated that after the sentencing hearing, he did not contact Ms. Irvin until he e-mailed in 2015. Tr. at 25.[15] Petitioner confirmed on cross-examination that he "chose" not to contact Ms. Irvin after his sentencing, Tr. at 52, even though he was aware of the fourteen-day window for filing a notice of appeal, Tr. at 22. Petitioner was aware that he could have called collect to the Federal Public Defender's Office, but he did not do so. Tr. at 53.[16] Notably, when he was at D. Ray James, Petitioner apparently had Ms. Irvin's business card with her contact information. Tr. at 74. Further, at the hearing, Petitioner indicated that the first time he thought about appealing his sentence was after he conducted legal research at Coleman. See Tr. at 27.[17]

---

[15]    As previously noted, this e-mail conversation did not involve discussions regarding an appeal. See Tr. at 26.

[16]    Petitioner's testimony on direct examination that he had no way of communicating with Ms. Irvin, Tr. at 21, and could not make a collect call to her, Tr. at 23, is discredited. This testimony is directly contradicted by his own testimony on cross-examination that he chose not to call Ms. Irvin even though he had the ability to do so. Tr. at 52. It is also inconsistent with Ms. Irvin's testimony that Petitioner could call her at no cost to him. Tr. at 92. Thus, the undersigned credits the testimony and notes of Ms. Irvin and Petitioner's testimony on cross-examination on this matter.

[17]    As noted, Petitioner was transferred to Coleman in July 2014, about a month and a half after he was sentenced. See Tr. at 24.

Additionally, there was no indication that Petitioner wanted to appeal based specifically on his status as an armed career criminal. Ms. Irvin testified that she had discussions with Petitioner about whether he could challenge his underlying convictions as qualifying offenses under the ACCA. <u>See</u> Tr. at 84. Petitioner confirmed he decided to cooperate after Ms. Irvin advised him he would not be successful in challenging the applicability of the ACCA. Tr. at 57-58, 62.[18] Petitioner acknowledged that he did not ask Ms. Irvin to raise any objections regarding the PSI, Tr. at 64, and that he never expressed any disagreement about his prior state convictions, Tr. at 40. Accordingly, Petitioner never reasonably demonstrated that he wanted to appeal any aspect of his sentence, including his status as an armed career criminal.

In sum, Ms. Irvin's documentation is consistent with her overall testimony. On the other hand, Petitioner's testimony is internally inconsistent, it is partially belied by the record, and his demeanor did not convince the undersigned that he was being truthful. Petitioner's testimony that he asked Ms. Irvin to discuss the possibility of an appeal is incredible, as is his representation in the § 2255 Motion that he instructed Ms. Irvin to appeal his sentence. The undersigned finds that Petitioner never instructed Ms. Irvin to file a notice of appeal. Indeed, Petitioner in substance affirmatively directed Ms. Irvin not to appeal. Thus, Ms. Irvin did not fail to file a notice of appeal in derogation of Petitioner's wishes. Alternatively, assuming that Petitioner did not affirmatively direct Ms. Irvin not to appeal, Ms. Irvin had no duty to consult with Petitioner about appealing. Accordingly, Petitioner's claim of ineffective assistance of counsel lacks merit.

---

[18]     Petitioner's testimony regarding whether Ms. Irvin discussed possible legal challenges to the ACCA is inconsistent. As noted above, Petitioner indicated on direct examination that Ms. Irvin never spoke with him about possible challenges to the ACCA. <u>See</u> Tr. at 9. Then, on cross-examination, Petitioner confirmed that Ms. Irvin discussed possible challenges with him, and that he decided to cooperate after she told him these challenges were not likely to be successful. Tr. at 57-58, 62. The undersigned credits Petitioner's cross-examination testimony on this point as it is consistent with Ms. Irvin's testimony and written documentation.

## IV. Conclusion

For all of the foregoing reasons, it is

**RECOMMENDED:**

That Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody (Doc. No. 1) be **DENIED as to Ground One**.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on June 4, 2018.

**JAMES R. KLINDT**
United States Magistrate Judge

bhc
Copies to:

Honorable Marcia Morales Howard
United States District Judge

Counsel of Record